1

2

3                                                          O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  BRETT LAUTER,                ) Case No. CV 15-08481 DDP (KSx)
                                 )
12             Plaintiff,        )
                                 )
13        v.                     ) **ORDER RE: MOTIONS TO DISMISS**
                                 )
14  MICHAEL ROSENBLATT; ECHO     )
    BRIDGE ENTERTAINMENT, LLC;   ) [DKT. NOS. 121, 126 and 179]
15  PLATINUM DISC. LLC; ECHO     )
    BRIDGE HOME ENTERTAINMENT;,  )
16                               )
               Defendants.       )
17                               )
    _____  )
18

19

20

21       Presently before the Court are a Motion to Dismiss Plaintiff's

22  Second Amended Complaint filed by Defendant Echo Bridge Acquisition

23  Corp. LLC ("EBAC") and a separate Motion to Dismiss filed by

24  Defendant Michael Rosenblatt. (Dkt. 121, 126.)  Having considered

25  the submissions of the parties, the court grants the EBAC motion in

26  part and denies the motion in part, grants the Rosenblatt motion,

27  and adopts the following Order.

28

## I.  Background

Plaintiff Brett Lauter ("Lauter") is the sole proprietor of Pan Global Entertainment ("PGE"). (Second Amended Complaint ("SAC") ¶ 18.)  Plaintiff acquires distribution rights to movies and other media and licenses those rights to other distributors.  Id.  As of early 2014, Lauter had sold numerous films to distributors Avail-TVN and Vubiquity, and had an "output agreement" with both companies regarding future releases.  (SAC ¶ 198.)  Lauter had also placed numerous films on distribution platforms such as Amazon's Instant Rentals, Google Play, and YouTube. (Id.)  Lauter had also engaged in license negotiations with Apple and VUDU.  (Id.)

On June 15, 2011, Plaintiff and Defendant Echo Bridge Entertainment ("EBE") entered into a "Multi Picture Deal/Acquisition of Digital Rights" Agreement ("the Agreement") with respect to ten films.[1] (SAC ¶ 23.)  The Agreement granted EBE a digital distribution license for the ten films (not including film "587: The Great Train Robbery") in North America in exchange for royalty payments to Lauter.  (Id. ¶ 25.)  The Agreement did not permit EBE to distribute free digital copies of the ten films or to use free copies of the films as marketing promotions. (Id. ¶ 127.)  The Agreement provided that all relevant notices would be directed to Vince Ravine, EBE's attorney, agent, and representative.  (SAC ¶ 26.)

Lauter alleges that EBE breached the Agreement by packaging free digital copies of the films together with DVD copies of the

---

[1] The SAC alleges that Defendant Rosenblatt is Chairman, CEO, President, managing partner, member, and majority shareholder of EBE and related entities.  (SAC ¶¶ 111, 114.)

same film and other films that Lauter did not own.  (SAC ¶ 127.)
EBE also failed to pay royalties owed.  (SAC ¶ 44.)  Lauter filed a
state court suit against EBE and obtained a default judgment for
the unpaid royalties.  (Id.)  Lauter attempted to contact EBE
regarding subsequent alleged breaches of the Agreement, but
received no response.  (Id. ¶ 45, 48.)   Lauter concluded that, as
a result of EBE's silence, continued breach, and perceived
insolvency, the Agreement terminated in February 2014.  (SAC ¶¶ 50,
150.)  Nevertheless, Lauter alleges, EBE and associated entities
continue to distribute the films.  (Id. ¶¶ 51-72.)

        After the initial filing of this lawsuit, Lauter alleges, EBE
shut down its office and disconnected all phone and e-mail
accounts.  (SAC ¶ 78.)  Sometime later, Defendant BHCIF, one of
EBE's lenders, foreclosed upon EBE's assets to satisfy a debt of
$37 million.  (Id. ¶ 77.)  Lauter alleges that EBE had assets
sufficient to cover its debts, but that BHCIF, an alleged insider,
nevertheless obtained EBE's assets for only $15 million in canceled
debt.  (Id. ¶ 185.)

        Soon after, BHCIF transferred some of EBE's former assets to
another entity, Defendant Echo Bridge Acquisition Corporation
("EBAC").  (SAC ¶ 82.)  Within three months, EBAC had obtained all
of EBE's former assets.  (Id. ¶ 85.)  Lauter alleges that BHCIF and
EBAC were not good faith transferees of EBE's assets, but rather
are EBE's successors.  (Id. ¶¶ 86, 100-108.)  In May 2015, Vince
Ravine, EBE's former attorney, agent, and representative, sent
Lauter an e-mail stating that EBAC had no relationship to Lauter or
to EBE.  (Id. ¶ 73.) Lauter further alleges that EBAC now

distributes two films in violation of Lauter's exclusive

distribution rights.[2]  (SAC ¶ 75.)

Lauter's SAC asserts the following claims against Defendants, including EBAC: (1) Breach of Contract, (2) Relief from Transfer under the Uniform Voidable Transaction Act (UVTA), (3) Interference with Prospective Economic Advantage, (4) Copyright Infringement or in the alternative Contributory or  Vicarious Liability Copyright Infringement, (5) Unfair Competition Claims in violation of 15 U.S.C. §1125 (a) [Lanham Act § 43 (a)] and California Business & Professions Code § 17200.  Of these, the SAC alleges claims for unfair competition, intentional interference, and copyright infringement against individual Defendant Michael Rosenblatt ("Rosenblatt") as well.  EBAC now moves to dismiss all claims against it.  Rosenblatt moves separately to dismiss all claims against him.

## II.   **Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me

---

[2] Films "587: The Great Train Robbery" and "Disturbed."

4

accusation." <u>Iqbal</u>, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." <u>Id.</u> at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted.  <u>Id.</u> at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." <u>Id.</u> at 679.  Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." <u>Twombly</u>, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  <u>Iqbal</u>, 556 U.S. at 679.

## III. Discussion

**A.** Successor Liability

Several of Plaintiff's claims against EBAC are predicated upon the allegation that EBAC is EBE's successor in interest. "[A] successor company has liability for a predecessor's actions if: (1) the successor expressly or impliedly agrees to assume the subject liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor; (3) the successor is a mere continuation of the predecessor; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping

5

liability for the seller's debts." <u>City of Los Angeles v. Wells</u>
<u>Fargo & Co.</u>, 22 F.Supp.3d 1047, 1062 (C.D. Cal. 2014).

### 1. Implied Assumption of Liability

Under California law, "to allege that a company is a
successor-in-interest because it expressly or impliedly agreed to
assume the liabilities of a predecessor, plaintiff must not only
plead the existence of an assumption of liability but either the
terms of that assumption of liability (if express) or the factual
circumstances giving rise to an assumption of liability (if
implied)." <u>Gerritsen v. Warner Bros. Entm't Inc.</u>, 116 F. Supp. 3d
1104, 1127 (C.D. Cal. 2015). In order to adequately plead an
implied assumption of liability, a plaintiff must allege that the
liabilities transferred were not limited, and that the parties
intended those unlimited liabilities to be transferred. <u>Pacini v.</u>
<u>Nationstar Mortg., LLC</u>, No. C 12-04606 SI, 2013 WL 2924441, at *5
(N.D. Cal. June 13, 2013).

Here, Plaintiff does not allege that EBAC expressly assumed
all of EBE's liabilities. With respect to implicit assumption of
liabilities, although Plaintiff alleges that BHCIF transferred
assets to EBAC, he specifically alleges that BHCIF transferred only
"certain" of EBE's assets to EBAC. Thus, by Plaintiff's own
account, the transfer to EBAC was not unlimited. Although
Plaintiff later alleges that EBAC did ultimately acquire all of
EBE's assets, there is no allegation in the SAC about the nature of
that eventual takeover nor any allegation that EBAC or BHCIF
intended EBAC to assume all of EBE's assets or liabilities. Thus,

Plaintiff fails to allege sufficient facts to support an assumption of liability theory.

2. Consolidation, Merger, and Mere Continuation

The merger theory of successor liability applies only "where one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other creditors." Gerritsen, 112 F. Supp. 3d at 1039 (internal quotation marks and emphasis omitted). Courts view the "mere continuation" theory for imposing successor liability as "merely a subset of the [consolidation or merger theory.]" Id. at 1040; see also Franklin v. USX Corp., 87 Cal. App. 4th at 615, 626 (2001). To prevail on such a theory, Plaintiff must demonstrate that "(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [and] (2) one or more persons were officers, directors, or stockholders of both corporations." CenterPoint Energy, Inc. v. Superior Court, 157 Cal. App. 4th 1101, 1120 (2007).

As discussed above, the SAC is somewhat internally inconsistent. On the one hand, Plaintiff alleges that BHCIF only transferred "certain" assets to EBAC, including a film library, trademarks, replication plant, businesses, and goodwill. There appears to be no dispute that other assets, including the Agreement, were not initially assigned to EBAC.[3] Such allegations

_____

[3] Although the parties appear to agree that the Agreement was not initially conveyed to EBAC, they differ as to why. Plaintiff
(continued...)

7

of a limited transfer of assets cannot support a merger theory of successor liability. Gerritsen, 112 F. Supp. 3d at 1039.

At the same time, however, Plaintiff alleges that EBAC did eventually acquire all of EBE's assets. Such an allegation, although relatively undeveloped in the SAC, could support a merger claim. Furthermore, the SAC makes other, more detailed allegations regarding a mere continuation theory. Plaintiff alleges, for example, that as of May 31, 2013, EBE owed nearly $58 million to creditors, of which $37 million was owed to BHCIF. Plaintiff further alleges that, although EBE's assets had a saleable value sufficient to cover all of its debts, BHCIF acquired all of those assets for only $15 million of canceled debt, leaving no assets to pay EBE's unsecured creditors. See CenterPoint Energy, 157 Cal. App. 4th at 1120. Plaintiff also alleges an overlap of ownership and corporate leadership among the various entities involved. Plaintiffs alleges, for example, that BHCIF was a stockholder of both EBE and EBAC, that Nathan Hart served as President of both EBHE (an EBE entity) and EBAC, and that Gerald Houghton was a Managing Member of both EBAC and BHCIF, which in turn controlled EBAC. (SAC ¶¶ 101-1, 102.) Plaintiff also alleges a continuity of enterprise, including EBAC's use of EBE's "same Wisconsin location, with the same telephone number, the same President and employees,

---

[3](...continued)
appears to suggest that the Agreement was not conveyed because it had already been terminated, while Defendant relies upon documentary evidence such as an "Assignment of Intangibles" to demonstrate that only some of EBE's assets were assigned to EBAC. The parties' arguments regarding the contents and meaning of this evidence and other documents, including an "Assignment of Specified Copyrights" and "Assignment of Bid" are ill suited to proceedings at the 12(b)(6) stage.

same film library, products, and packaging, and the same customers
. . . ." (SAC ¶ 101-4.)  Thus, notwithstanding Plaintiff's
allegations that BHCIF did not <u>initially</u> transfer all of EBE's
assets to EBAC, the allegations of the SAC are sufficient to
sustain a de facto merger or mere continuation theory of successor
liability.  <u>See</u>, <u>e.g.</u> <u>United States v. Sterling Centrecorp, Inc.</u>,
960 F.Supp.2d 1025, 1041 (E.D. Cal. 2013).

     3.  Fraudulent Purpose

  Plaintiff has also adequately alleged facts that support a
plausible inference that the transfer of assets from EBE to
EBAC through BHCIF was for the purpose of escaping liability.
<u>See</u> <u>CenterPoint Energy</u>, 157 Cal. App. 4th at 1120.  In addition to
alleging that BHCIF obtained EBE's assets for insufficient
consideration, thus frustrating claims by EBE's unsecured
creditors, Plaintiff alleges that BHCIF was an insider of EBE.
BHCIF had a warrant to purchase sufficient shares of EBE stock to
take control of EBE, and received monthly reports of EBE's
financial condition.  Thus, Plaintiff alleges, BHCIF was well aware
of EBE's insolvency and well-positioned to orchestrate a fraudulent
transfer of EBE's assets to EBAC, which BHCIF also owned and
managed.  The fact that EBAC allegedly continued EBE's operations,
as discussed above, further supports an interference that BHCIF
orchestrated the transfer of assets from EBE to EBAC for the
purpose of avoiding the former's liabilities.

  Accordingly, to the extent EBAC seeks to dismiss claims
predicated upon a successorship theory of liability, the motion is
denied.

9

B.    Uniform Voidable Transactions Act

EBAC also argues that Plaintiff's Uniform Voidable Transactions Act ("UVTA") claim must be dismissed for failure to specify the law under which the claim is brought.  The UVTA, formerly the Uniform Fraudulent Transfer Act, is a model code section drafted by the Uniform Law Commission, and has not yet been adopted in most states. <u>See</u> http://www.uniformlaws.org/Act.aspx?title=Voidable%20Transactions%20Act%20Amendments%20%282014%29%20-%20Formerly%20Fraudulent%20Transfer%20Act.  Claims under the UVTA, or "in the nature of a claim for relief" under UVTA, are governed "by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." UVTA § 10 (b).  Plaintiff's SAC, however, alleges that EBE and related Defendants are citizens of states that have not adopted the UVTA.  California, in contrast, has adopted portions of the UVTA. <u>See</u> Cal. Civil Code § 3439 et seq.  Although Plaintiff's Opposition asserts that EBE's headquarters were in California and that EBAC is currently headquartered there, the SAC contains no such allegations, nor any other indication that Plaintiff's UVTA claims are based upon California law.[4]  Plaintiffs UVTA claim, therefore, does not give Defendant fair notice of the nature of or basis for the claim.  <u>See</u> <u>Twombly</u>, 550 U.S. at 554; Fed. R. Civ. P. 8. Accordingly, Plaintiff's UVTA claim is dismissed, with leave to amend.

---

[4] Plaintiff's Opposition also asserts that California law applies by dint of a choice of law provision in the Agreement.

C.    Interference With Prospective Economic Advantage

To satisfy the elements of the tort of intentional interference with prospective economic advantage, a plaintiff must show (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.  Marsh v. Anesthesia Serv. Med. Group. Inc., 200 Cal. App. 4th 480, 504 (2011) (citing Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1153.)  For purposes of the first element, "to show an economic relationship, the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference."  California Expanded Metal Prod. Co. v. Clark Western Dietrich Bldg. Sys. LLC, No. CV 12-10791 DDP MRWX, 2014 WL 5475214, at *4 (C.D. Cal. Oct. 29, 2014) (citation omitted).

Plaintiff's SAC alleges that Defendants interfered with Plaintiff's economic relationships with seven third-party licensees.  Of those, Plaintiff alleges that he had ongoing relationships with, or had already licensed films to, Avail-TVN, Vubiquity, Amazon, and Google.  The SAC does not allege any facts, however, to support a claim that Plaintiff had an economic relationship with Dish Network.  With respect to Apple and VUDU, the SAC alleges only that Plaintiff "had been in negotiations" with those distributors prior to entering into the Agreement with EBE.

The SAC fails to allege, therefore, the existence of an economic relationship between Plaintiff and Dish Network, Apple, or VUDU, let alone the probability that Plaintiff would derive an economic benefit from any such relationship.

Furthermore, the SAC does not plausibly allege that EBAC knew of Plaintiff's alleged relationship with any third party distributors. As an initial matter, the SAC refers only to "Defendants," without specifying which Defendant knew what, or how. In addition, the SAC alleges that Defendants (as an undifferentiated group) knew of the relationships because (1) there are few licensees of digital media rights in North America and (2) Plaintiff had a "background as a film sales agent" and therefore "could sell" to third party licensees. (SAC ¶¶ 195-196.) Even assuming these allegations in the light most favorable to Plaintiff, the mere fact that Plaintiff had the requisite background and theoretical ability to grant licenses to the small number of customers in the relevant market does not give rise to a plausible inference that EBAC knew that Plaintiff had an economic relationship with any of those potential customers.

Plaintiff's intentional interference claims are, therefore, dismissed, with leave to amend.[5]

D.   Copyright Infringement

---

[5] The court notes that, with respect to films "587: The Great Train Robbery" and "Disturbed," if Plaintiff successfully establishes EBAC's successor liability, EBAC, as a potential party to a contract involving distribution of the two films, may not be liable for intentional interference with that same contract. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 514 (1994).

Plaintiff alleges that, notwithstanding the alleged termination of the Digital Agreement between Plaintiff and EBE on June 30, 2014, EBE continued to distribute digital copies of the films. Plaintiff asserts that as a successor to EBE, EBAC is liable for copyright infringement. However, even if not a successor to EBE, Plaintiff alleges that EBAC is liable for copyright infringement for its DVD distribution of the films "587: The Great Train Robbery" and "Disturbed."

To prove a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. L.A. Printex Indus., Inc.v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, (1991)); see also S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir. 1989) ("To prevail on its claim of copyright infringement, [the copyright owner] must prove . . . 'copying' of protectable expression by [the accused infringer] beyond the scope of [the] license."). Courts in this circuit regularly apply these requirements at the pleading stage. Muromura v. Rubin Postaer & Assocs., No. CV 12-09263 DDP AGRX, 2014 WL 4627099, at *2 (C.D. Cal. Sept. 16, 2014). A defendant may be held contributorily or vicariously liable for copyright infringement. MDY Indus., LLC v. Blizzard Entm't, Inc., 629 F.3d 928, 937 (9th Cir. 2010). A defendant is liable for contributory infringement if it has "intentionally induced or encouraged direct infringement." Id. A defendant is liable for vicarious infringement if it (1) has the right and ability to control the infringing party's infringing

activity, and (2) derives a direct financial benefit from the activity. Id. at 937-8.

EBAC's arguments regarding Plaintiff's copyright claim are somewhat unclear.[6] First, EBAC contends that Plaintiff does not allege that EBAC copied any of his works, but rather premises his copyright claim against EBAC on the allegation that EBE infringed. (Mot. at 21:3-9.) As discussed above, however, Plaintiff has adequately alleged that EBAC is a successor to EBE. Furthermore, the SAC does allege "that EBAC is selling and distributing two films, 'Disturbed' and 'Old 587: The Great Train Robbery,' for which Lauter is the exclusive North American licensee and distributor," and incorporates that allegation into Plaintiff's copyright claim. (SAC ¶¶ 75, 210.)

EBAC proceeds to argue that, even if Plaintiff's allegations are true, its DVD distribution of the two films does not "implicate the digital rights at issue under the Digital Agreement." (Mot. at 21:15.) Plaintiff does not dispute that he granted DVD rights, as opposed to digital distribution rights, to Platinum, a wholly-owned subsidiary of EBE, under a "Video Agreement" separate from the ten-film "Digital Agreement." (Opp. at 20.) Although EBAC does not

---

[6] The court notes that EBAC does not directly address its copyright arguments in its Reply. Instead, EBAC suggests that this court should dismiss Plaintiff's rescission claims, upon which, EBAC argues, Plaintiff's copyright claim depends. (Reply at 6-7.) As discussed below, Plaintiff's copyright claim does not appear to be predicated exclusively upon EBE's conduct. In any event, EBAC did not raise its rescission argument in its motion, and this court will not consider it here. See, e.g. Ass'n of Irritated Residents v. C & R Vanderham Dairy, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief.").

state as much in its motion, it appears to suggest that it obtained
Platinum's interest in the Video Agreement and, therefore, had a
license to engage in the alleged DVD distribution.  Plaintiff,
however, not only disputes the validity of any supposed assignment
of the Video Agreement from Plaintinum to EBAC, but also asserts
that Platinum's rights under the Video Agreement expired as early
as 2015 and no later than April 2017.[7]  (Opp. at 20-21.)  The
distinction between the rights at issue in the Digital Agreement
and Video Agreement, therefore, do not warrant dismissal of
Plaintiff's copyright claims against EBAC.

Lastly, EBAC asserts that "Plaintiff has not properly alleged
his foundational assumption that the digital rights to 587 and the
10 films were assigned to EBAC."  (Mot. at 22:4-6.)  The import of
this argument is not clear to the court.  As discussed above,
Plaintiff does allege that those digital rights were assigned to
EBAC, and indeed must so allege if he is to maintain claims based
upon successor liability.  Furthermore, Plaintiff's direct
copyright claim against EBAC appears to have little relation to
allegations regarding digital rights.  Plaintiff alleges that EBAC
unlawfully distributes DVD copies of "Old 587" and "Disturbed."
Possible infirmities in Plaintiff's allegations regarding the
assignment of digital rights to EBAC have no bearing on this
allegedly infringing video distribution.

---

[7] Implicit disagreements about the meaning of certain
declarations and exhibits appear to be beyond the scope of 12(b)(6)
proceedings.  (See n.2, supra.)

1    Accordingly, EBAC's Motion to Dismiss is denied with respect
2 to Plaintiff's copyright claim.

3    E.    Lanham Act Unfair Competition

4    Plaintiff's Eighth Cause of Action alleges that EBAC's
5 infringing use Plaintiff's unregistered trademarks in the titles of
6 the ten films constitutes unfair competition in violation of the
7 Lanham Act, 15 U.S.C. § 1125(a).  EBAC argues that this claim is
8 duplicative of Plaintiff's copyright claim and preempted by the
9 Copyright Act.  The court agrees.

10    The Copyright Act preempts rights under common law or state
11 statutes that "are equivalent to any of the exclusive rights within
12 the general scope of copyright . . . ."  17 U.S.C. § 301(a).  The
13 Supreme Court has extended the Copyright Act's preemptive effect to
14 trademark claims under the Lanham Act, 15 U.S.C. § 1125, as well.
15 See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23,
16 33-8 (2003).  In conducting a preemption analysis, the reviewing
17 court must first determine whether the subject matter of the
18 arguably preempted claim falls within the subject matter of
19 copyright and, if so, determine whether the rights asserted are
20 equivalent to the copyright rights set forth in 17 U.S.C. § 106.
21 Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc., 170 F.
22 Supp. 3d 1249, 1264 (C.D. Cal. 2016).

23    Here, there is no serious dispute that the subject matter of
24 Plaintiff's Lanham Act claim falls within the subject matter of
25 copyright and seeks to vindicate the same rights.  Section 102 of
26 the Copyright Act explicitly includes motion pictures.  17 U.S.C. §
27 102(a)(6).  Although Plaintiff's three-sentence opposition

28

contends, without any citation to authority, that his Lanham Act claim is limited to "proprietary film titles," that characterization is inconsistent with the substance of the SAC. (Opp. at 25.) Indeed, some courts have concluded that Lanham Act claim regarding trademarks to titles fall outside of the Copyright Act. In Bach v. Forever Living Products U.S., Inc., 473 F.Supp.2d 1110 (W.D. Wash. 2007), the court concluded that a trademark claim based upon the title of a book was not preempted because the title served a source-identifying function that was at the core of trademark law, and did not involve the protection of creative work underpinning copyright law. Bach, 473 F.Supp.2d at 1118; see also Capcom Co. Lard v. MRK Group, Inc., No. C-08-0904 RS, 2008 WL 4661479 at *12 (N.D. Cal. Oct. 20, 2008) ("[Counterclaimant] sufficiently pled source identifying elements[, including portions of a motion picture title], rather than the ideas and creative content that Dastar prohibits. These source identifying elements are what the Lanham Act is intended to protect . . . .").

Here, however, notwithstanding the SAC's brief reference to consumer confusion, Plaintiff's Lanham Act claim does not emphasize the source-identifying role of the films' titles. Instead, Plaintiff's Lanham Act claim seeks redress for EBAC's unauthorized distribution of Lauter's films. See FAC ¶ 264 ("EBAC without any authority advertised and offered for sale Lauter's films 'Disturbed' and '587: The Great Train Robbery' on its website . . . ."). Because that unauthorized distribution falls squarely within

17

the Copyright Act, Plaintiff's Lanham Act claim against EBAC is
preempted.[8]

    F.  Claims against Rosenblatt

    Although only some of the SAC's claims for relief name
Rosenblatt individually, Plaintiff appears to allege that
Rosenblatt is individually liable as an alter ego of EBE.[9]  (SAC ¶¶
111, 114-15, 120-21).  Defendant Rosenblatt argues that the SAC's
alter ego and other allegations against Rosenblatt are inadequately
pled.  (Dkt. 126.)

    "The alter ego doctrine arises when a plaintiff comes into
court claiming that an opposing party is using the corporate form
unjustly and in derogation of the plaintiff's interests. In certain
circumstances the court will disregard the corporate entity and
will hold the individual shareholders liable for the actions of the
corporation."  Nielson v. Union Bank of Cal., N.A., 290 F. Supp. 2d
1101, 1115 (C.D. Cal. 2003).  The purpose of the alter ego doctrine
is to avoid injustice when there is an abuse of the corporate
privilege.  Id.

    Only "exceptional circumstances" allow a court to disregard
the corporate form and find liability as to individuals.  Leek v.
Cooper, 194 Cal. App. 4th 399, 411 (2011).  A wide variety of
factors may be pertinent to the alter ego inquiry, depending on the

---

    [8] Because claims other than Plaintiff's copyright claim
survive, this court need not address EBAC's argument that the
Copyright Act preempts Plaintiff's unfair business practices claim
under California Business & Professions Code § 17200.

    [9] The SAC appears to allege that Rosenblatt is an alter ego of
EBE, Platinum, and Echo Bridge Home Entertainment (collectively,
the "EBE Entities") as well as that each of the entities is an
alter ego of the other entities.

circumstances of the particular case.  <u>Assoc. Vendors, Inc. v.</u>
<u>Oakland Meat Co.</u>, 210 Cal. App. 2d 825, 838 (1962).  These factors
include, but are not limited to, commingling of funds, unauthorized
diversion of corporate funds to other uses, failure to maintain
adequate corporate records, sole or family ownership of all of the
stock in a corporation, failure to adequately capitalize a
corporation, use of a corporation as a conduit for the business of
an individual, disregard of legal formalities, and diversion of
assets from a corporation to a stockholder to the detriment of
creditors.  <u>Schwarzkopf</u>, 626 F.3d at 1038; <u>Zoran Corp. v. Chen</u>, 185
Cal. App. 4th 799, 811-12 (2010); <u>Assoc. Vendors</u>, 210 Cal. App. 2d
at 838-39; <u>but</u> <u>see</u> <u>Leek</u>, 194 Cal. App. 4th at 415 ("An allegation
that a person owns all of the corporate stock and makes all of the
management decisions is insufficient to cause the court to
disregard the corporate entity.").  "Conclusory allegations of
'alter ego' status are insufficient to state a claim.  Rather, a
plaintiff must allege specific facts supporting both of the
elements of alter ego liability."  <u>Gerritsen v. Warner Bros. Entm't</u>
<u>Inc.</u>, 112 F. Supp. 3d 1011, 1042 (C.D. Cal. 2015).

    Here, the SAC alleges that Defendant Rosenblatt "disregarded
corporate formalities" by serving as Chairman, CEO, President,
managing partner, and member of all of the EBE Entities, and was a
majority shareholder of the entities.  (SAC ¶¶ 111, 114.)  The SAC
also alleges that the EBE Entities were undercapitalized, as
evidenced by their dissolution, described above.  (SAC 115.)
Plaintiff further alleges that Rosenblatt "used the corporate

entity unjustly to circumvent a statute . . . [by engaging] in
rampant copyright and trademark infringement . . . .”  (SAC ¶ 120.)

Putting aside Plaintiff’s conclusory use of the elements of an
alter ego claim, the specific facts alleged cannot support the
imposition of alter ego liability upon Rosenblatt.  The SAC does
arguably allege a “critical fact” that the EBE Entities were
undercapitalized.  See Katzir's Floor & Home Design, Inc. v.
M-MLS.com, 394 F.3d 1143, 1149 (9th Cir. 2004).  However, “courts
have cautioned against relying too heavily in isolation on the
factors of inadequate capitalization or concentration of ownership
and control.”  Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th
1205, 1213, 11 Cal. Rptr. 2d 918, 923 (1992).  With respect to
disregard of corporate formalities, the SAC does not specify which
formalities Rosenblatt disregarded, but instead alleges only that
Rosenblatt served in multiple corporate roles and was a majority
shareholder.[10]  “Allegations that the defendant was the sole or
primary shareholder are inadequate as a matter of law to pierce the
corporate veil.  Even if the sole shareholder is entitled to all of
the corporation’s profits, and dominated and controlled the
corporation, that fact is insufficient by itself to make the
shareholder personally liable.”  Katzir's Floor & Home Design, 394
F.3d at 1149 (9th Cir. 2004) (internal alteration, quotation marks,
and citation omitted).  Lastly, Plaintiff’s allegations regarding

---

[10] The court does not address an apparent factual dispute
regarding the timing of Rosenblatt’s resignation from the EBE’s
entities.  Although Plaintiff’s Opposition asserts that Rosenblatt
either continued to be involved in the EBE Entities’ business or
somehow disregarded corporate forms well into 2017, no such
allegations appear in the SAC.

Rosenblatt's unjust use of the corporate form to violate copyright and trademark laws fails to identify any acts separate from those of the corporate entity.  These allegations do not support an alter ego theory of liability, as "[c]orporate officers and directors cannot ordinarily be held personally liable for the acts or obligations of their corporations."  Taylor-Rush v. Multitech Corp., 217 Cal. App. 3d 103, 113 (1990).

Nor has Plaintiff adequately alleged facts sufficient to establish Rosenblatt's individual liability.  Notwithstanding the general distinction between the acts of corporate directors and those of their corporations, individuals "may become liable if they directly authorize or actively participate in wrongful or tortious conduct."  Taylor-Rush v. Multitech Corp., 217 Cal. App. 3d 103, 113 (1990).  As an initial matter, it is far from clear that Plaintiff intended allege Rosenblatt's individual liability separate from Plaintiff's alter ego theory.  Although the SAC does allege that Rosenblatt "engaged in tortious conduct," it does so in the context of alter ego allegations and an exhortation to this Court to "disregard the corporate entities."  (SAC ¶ 121.) Furthermore, each of the causes of action that lists Rosenblatt as an individual Defendant alleges that "Rosenblatt is the alter ego of EBE and is therefore liable for all damages herein described." (SAC ¶¶ 207, 229, 254, 271.)  In any event, Plaintiff's allegations that Rosenblatt "was aware of" tortious conduct and "had the right and ability to supervise" other employees do not rise to the level of active participation necessary to support individual liability.

1    Accordingly, all claims against Rosenblatt are dismissed, with

2    leave to amend.

3    **IV.  Conclusion**

4    For the reasons stated above, EBAC's Motion to Dismiss is

5    GRANTED in part and DENIED in part.  EBAC's motion is denied with

6    respect to Plaintiff's copyright claim and claims predicated upon

7    EBAC's successor liability.  Plaintiff's UVTA claim and intentional

8    interference claims are DISMISSED, with leave to amend.

9    Plaintiff's Lanham Act claim is DISMISSED, with prejudice.

10   Defendant Rosenblatt's Motion is GRANTED.  Plaintiff's claims

11   against Rosenblatt are DISMISSED, with leave to amend.  Any amended

12   complaint shall be filed within fourteen days of the date of this

13   Order.[11]

14

15   IT IS SO ORDERED.

16

17

18   Dated: December 6, 2017

18                                    DEAN D. PREGERSON

19                                    United States District Judge

20

21

22

23

24

25

26

27   [11] Leave to amend is limited to the scope described in this
     Order.  Any amended claims with respect to Defendant Rosenblatt
28   must also be consistent with the remainder of this Order.